**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL G. FOX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:13cv0010 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Michael Fox (Plaintiff) for disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Acting Commissioner has filed a brief in support of her answer.

## Procedural History

Plaintiff applied for DIB and SSI in November 2009, alleging he was disabled as of November 1, 2008, because of bipolar affective disorder, depression, and anxiety. (R.[1] at 138-44, 199.) His applications were denied initially and after a hearing held in August 2011

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

before Administrative Law Judge (ALJ) Thomas G. Norman. (<u>Id.</u> at 7-22, 28-57, 59, 62-6753.) After considering additional evidence, the Appeals Council denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner. (<u>Id.</u> at 1-5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel; Charles R. Poor, N.C.C. (National Certified Counselor); and Ashok Khushalani, M.D., testified at the televised administrative hearing.

Plaintiff testified that he was then 27 years old, has completed the eleventh grade, and has a General Equivalency Degree ("GED"). (<u>Id.</u> at 31.) He has on-the-job training as a welder. (<u>Id.</u>)

His last job was as a welder. (<u>Id.</u> at 32.) He left that job because he was doing "tedious stuff" and was unable to keep up with his normal job functions due to his anxiety and stress. (<u>Id.</u>) He described his anxiety and depression as constantly thinking about what he has gone through in life and as preventing him from concentrating. (<u>Id.</u> at 33.) He takes mood stabilizing medications, including alprazolam four times a day and Klonopin three times a day. (<u>Id.</u>) On a bad day, he is a recluse. (<u>Id.</u> at 34.) Anything can trigger a bad day. (<u>Id.</u>) At least twice a day, he has a severe panic attack and has to hide somewhere. (<u>Id.</u>)

On a good day, he tries to do something, but he does not have the aptitude he once had. (<u>Id.</u> at 35.) His memory is such that he sometimes cannot recall birth dates or his child's middle name. (<u>Id.</u>) His memory used to be excellent. (<u>Id.</u>) His ability to concentrate is "almost non-existent." (<u>Id.</u> at 36.)

Also, he has vascular migraines that cause extreme pain that radiates from the back of his neck to the top of his head.  (Id.)  His insurance only covers nine migraine pills a month.  (Id.)  Sometimes, he has migraines every other day for all day.  (Id. at 37.)  The medication helps take the edge off, and would help more if he could afford more pills.  (Id.)  When he has a migraine, he cannot do anything and has to sit or lie down with a towel over his eyes.  (Id.)  This happens at least three times a week.  (Id.)  He has pain in his back and numbness and tingling in his hands, arms, and feet.  (Id. at 39.)

Plaintiff testified he either sleeps a lot or not at all.  (Id. at 38.)

Plaintiff is on at least seven medications.  (Id. at 40.)  He was having seizures, i.e., blackouts, tunnel vision, and memory loss, for which he was taking Depakote.  (Id.)  It made the seizures worse.  (Id.)  He stopped taking it earlier that month, and has not had severe seizures since.  (Id. at 40, 43.)

Plaintiff has been treated for anxiety since he was thirteen years old.  (Id. at 41.)  For awhile, he controlled his temper.  (Id.)  When a child of his was born prematurely, his wife noticed something in him changed.  (Id.)

Dr. Khushalani testified that he is a board-certified psychiatrist.  (Id. at 42.)  He summarized Plaintiff's medical records as follows.

> [Plaintiff] has a longstanding history initially of depression.  He was being treated by his family physician – through a medical clinic. [H]e was diagnosed as having bipolar disorder and also panic disorder with a GAF [Global Assessment of Functioning] of 50[2] and more recently psychiatric records . . .

---

[2]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's

at Arthur Center, evidence having [sic] bipolar disorder and Attention Deficit Hyperactivity Disorder [ADHD]. In between, as he said, he has been seen at – those medical clinics by Dr. Kondro. The only psychiatric treatment record . . . [is from] the Arthur Center. Now, he has this bipolar disorder and Attention Deficit Disorder. At the Arthur Center he was being treated for ADHD with Adderall. For his anxiety it was Xanax and Klonopin. And for his bipolar disorder it was Depakote and Ability. . . . The records from the Arthur Center indicate most of his GAF's are between 60 and 65,[3] which would indicate mild symptomatology; the only lower GAF was the consultative, it was in 2010. But recent GAF's, according to the Arthur Center, have been indicate of mild symptomatology. I reviewed Dr. Bhalla's medical assessment of ability to do work-related activities, and most of the parameters she rated as fair. [T]he daily activities are diminished but not precluded. So he does not have any history of hospitalization. [H]e's not in counseling. So the lack of intensity of treatment, lack of hospitalizations suggest that the symptomatology is mild to moderate. . . . His activities of daily living are moderately affected . . . .

Maintain [sic] social functioning is moderately affected. Maintaining concentration, persistence or pace is moderately affected. He has not had any episodes of decompensation.

(Id. at 44-46.) (Footnotes added.)

---

overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

[3]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

Asked by the ALJ to describe Plaintiff's residual functional capacity ("RFC"), Dr. Khushalani testified Plaintiff has no limitations in his ability to understand, remember, and carry out simple instructions; has moderate limitations in his ability to understand, remember, and carry out complex instructions; has moderate limitations in his ability to make judgments on complex work-related decisions; has mild limitations in his ability to interact appropriately with the public and with co-workers; has no limitations in his ability to interact appropriately with supervisors; and has mild limitations in his ability to respond appropriately to usual work situations. (Id. at 46.)

Mr. Poor was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and past work experience who is capable of medium work but is limited to no heights or climbing, no moving or dangerous equipment, and no commercial driving. (Id. at 50-51.) This claimant also has the mental RFC described by Dr. Khushalani. (Id. at 51.) Asked if this claimant can perform Plaintiff's past relevant work, Mr. Poor replied he can not. (Id.) He can, however, do a "very wide range of unskilled work, and a very significant range of semiskilled jobs." (Id.) Examples of the semiskilled jobs are team assembler, with a *Dictionary of Occupational Titles* ("DOT") code of 706.687-010; a hand grinder/polisher, with a DOT code of 603.280-010; and tool grinder, with a DOT code of 701.381-018. (Id. at 58.) Examples of the unskilled jobs are a kitchen helper, with a DOT code of 318.687-010; laundry worker, with a DOT code of 361.685-018; and landscape worker, with a DOT code of 406.684-014. These jobs exist in significant numbers in the state and national economies. (Id. at 52-53.)

If, as Plaintiff testified he does, the claimant has to lie down for at least two hours during an ordinary work day or has to miss at least three days of work a month because of illnesses, there are no jobs the claimant can perform. (Id. at 53.) And, if the claimant has a reduction of 30 to 50 percent in his ability to function in work-related areas, competitive employment is precluded. (Id. at 54.) The highest percentage at which a claimant can "probably" still function is 20. (Id. at 55.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessment of his mental functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report,[4] listing his height as 6 feet and his weight as 245 pounds. (Id. at 198.) His impairments, see page one, supra, limit his ability to work by preventing him from completing any tasks, sitting still, focusing, and making decisions. (Id. at 199.) He is easily stressed and is unable to handle normal pressure. (Id.) He is depressed, confused, and always tired. (Id.) He has headaches, nausea, vomiting, muscle twitches, and tunnel vision. (Id.) His weight fluctuates within a thirty to forty pound range. (Id.) Plaintiff's impairments first bothered him in 1996 and prevented him from working as of November 1, 2008. (Id.) He was given special concessions on his job, and finally stopped working on April 28, 2009. (Id.) His medications

---

[4]The report is completed in the third person and the first person. For ease of reference, the Court will assume it was completed by Plaintiff.

include Abilify, alprazolam, citalopram, and lamotrigine.  (<u>Id.</u> at 205.)  All were prescribed by Dr. Kondro for depression.  (<u>Id.</u>)  Only the alprazolam, which is also prescribed for anxiety, helps, but not for long.  (<u>Id.</u>)  He finished the eleventh grade;  he was not in special education classes.  (<u>Id.</u> at 206.)

Plaintiff also completed a Function Report.  (<u>Id.</u> at 216-23.)  Asked to describe what he does during the day, he reported he has no routine.  (<u>Id.</u> at 216.)  If he is able to sleep, he gets up, watches television, plays with his children, and falls asleep on the couch.  (<u>Id.</u>)  He tries to help his wife get their oldest child ready for preschool.  (<u>Id.</u>)  He does not take care of anyone else or of any pets.  (<u>Id.</u> at 217.)  His parents help take care of his three children when his wife is away.  (<u>Id.</u>)  His parents also get his prescriptions filled and dispense his medications to him at the appropriate times.  (<u>Id.</u> at 218.)  He has to be told when to shave or change clothes.  (<u>Id.</u>)  The only household chore he does is to cut the grass; he uses a riding mower.  (<u>Id.</u>)  His impairments adversely affect his abilities to stand, sit, talk, see, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others.  (<u>Id.</u> at 221.)  He cannot walk farther than thirty feet and then must rest until his dizziness stops.  (<u>Id.</u>)  He cannot pay attention for longer than a few minutes.  (<u>Id.</u>)  Because of his blurred vision and inability to focus, he cannot follow written instructions.  (<u>Id.</u>)  Because of his inability to focus, he cannot follow spoken instructions.  (<u>Id.</u>)  He is anxious around authority figures.  (<u>Id.</u> at 222.)  He does not handle stress or changes in routine well.  (<u>Id.</u>)

Plaintiff's mother completed a Function Report Adult – Third Party on his behalf.  (Id. at 208-15.)  Her answers generally mirror his.  When asked what he was able to do before his impairments that he can no longer do, she responded that he has had problems most of his life taking care of himself.  (Id. at 209.)

On a Disability Report – Appeal form completed after the initial denial of his applications, Plaintiff reported that his conditions have worsened since a fall in March 2010.  (Id. at 227.)

The relevant medical records before the ALJ are summarized below in chronological order, beginning with a November 2008 visit to Eric Kondro, M.D., for complaints of chronic anxiety.  (Id. at 276.)  An increased dosage of Lexapro had not helped, and had caused insomnia.  (Id.)  He had taken some alprazolam, and it had helped.  (Id.)  On the checklist format to indicate the results of his examination, Dr. Kondro marked that Plaintiff was anxious, but not depressed or experiencing hallucinations.  (Id.)  Those were the only three choices listed for psychiatric symptoms.  (Id.)  There were also three choices listed for neurological symptoms, one of which was seizures.  (Id.)  None were checked.  (Id.)  Dr. Kondro's diagnosis was chronic anxiety and insomnia and a tear in Plaintiff's left knee cartilage.  (Id.)  Alprazolam was prescribed.[5]  (Id.)

---

[5]Two other medications were prescribed; their names are illegible.

Early in 2009,[6] Plaintiff saw Dr. Kondro for a bacterial skin infection he had developed when using water jetty equipment. (Id. at 275.) His psychiatric symptoms included both anxiety and depression. (Id.)

Plaintiff was seen at the emergency room at St. John's Mercy Hospital on June 4 for complaints of abdominal pain and dizziness. (Id. at 247-66.) He explained that he had eaten hot dogs the day before and had woken up that morning with shaking, chest tightness, back pain, fever, and vomiting. (Id. at 248.) His medical history was significant for anxiety, for which he took alprazolam. (Id. at 250, 251.) A computed tomography ("CT") scan of his abdomen and pelvis was normal, as were x-rays of his chest. (Id. at 255, 262.) He was treated with medications and discharged within two hours with a prescription for doxycycline (an antibiotic) and instructions not to work for two days. (Id. at 253, 257, 259.)

Plaintiff saw Dr. Kondro in June for sores on his legs and was diagnosed with a chronic skin infection due to exposure at work to contaminated water. (Id. at 274.) His other diagnosis was chronic anxiety. (Id.) The checklist on the progress notes did not include any psychiatric symptoms. (Id.)

Plaintiff returned to Dr. Kondro in August, reporting that he was very depressed. (Id. at 273.) Plaintiff said that, on reflection, he had been so for years. (Id.) He was paranoid, jittery, and, occasionally, edgy. (Id.) His sleep was poor. (Id.) Dr. Kondro's diagnosis was chronic depression and anxiety, for which he prescribed citalopram and lamotrigine. (Id.) Plaintiff was to taper off the alprazolam. (Id.)

---

[6]The month of the visit is illegible; however, it appears to be a "2" or "3."

In October, Plaintiff told Dr. Kondro he was not doing well; he was very anxious, very moody, and paranoid. (Id. at 272.) He could not sleep or focus. (Id.) He felt depressed and hopeless. (Id.) His affect was flat and anxious. (Id.) Dr. Kondro diagnosed him with anxiety, panic attacks, depression, and bipolar affective disorder. (Id.) His dosages of citalopram and lamotrigine were increased; Abilify was added. (Id.) On the progress notes and on a separate paper, Dr. Kondro wrote: "[Plaintiff] is currently disabled with bipolar affective disorder and is unable to work."[7] (Id. at 268, 341.)

Plaintiff next saw Dr. Kondro in January 2010. (Id. at 271.) He reported that he was drowsy all day and sleeping poorly at night. (Id.) His heart was pounding. (Id.) In addition to dental problems, Plaintiff's diagnoses were attention deficit disorder ("ADD"), generalized anxiety disorder ("GAD"), and insomnia. (Id.) Plaintiff was prescribed clonazepam (the generic form of Klonopin), alprazolam, Adderall, and a fourth medication, the name of which is illegible. (Id.)

In March, Plaintiff went to the emergency room at Herman Area District Hospital after falling down steps and injuring his face, left knee, and left ankle. (Id. at 304-15.) His current medications included Abilify, Zyloprim (prescribed to treat kidney stones), and Xanax (brand name form of alprazolam). (Id. at 305.) X-rays of the knee and ankle were normal. (Id. at

---

[7]A December 2010 note from Dr. Kondro reads the same. (Id. at 342.) And, an unsigned August 2002 letter on Wellsville Medical Center stationery reads that Plaintiff "has been treated for depression and anxiety since 4 21 98." (Id. at 267, 340.) Wellsville Medical Center is Dr. Kondro's practice.

305, 313-14.)  Plaintiff was diagnosed with a strain of his left knee and ankle, had his left foot placed in a gel cast, and was discharged with prescriptions for amoxicillin and Vicodin. (<u>Id.</u> at 305, 311, 315.)

In June, Plaintiff was treated by Sunil M. Apte, M.D., at Patients First Health Care for kidney stones that had been causing him severe pain for the past month.  (<u>Id.</u> at 316-18.)  He presented positive for anxiety and depression and negative for poor or worsening memory, blurred vision, seizures, and tremors.  (<u>Id.</u> at 317.)  Chronic problems included major depressive disorder, single episode, unspecified, and anxiety state, unspecified.  (<u>Id.</u>)  A CT scan of his abdomen was to be scheduled.  (<u>Id.</u> at 318.)  His current medications included alprazolam, Ambien, Lexapro, Percocet, and Vicodin.  (<u>Id.</u> at 316.)  They were continued. (<u>Id.</u> at 318.)  The CT scan revealed a small, two millimeter kidney stone in his right ureter. (<u>Id.</u> at 326-29.)

Plaintiff returned the next month with the same problem.  (<u>Id.</u> at 319-22.)  A right ureteroscopy was to be performed in eight days, and was.  (<u>Id.</u> at 319, 330-31.)

Plaintiff returned to Dr. Apte in September for treatment of a stone in his left ureter. (<u>Id.</u> at 323-25.)  It was noted that he demonstrated an "appropriate mood and affect."  (<u>Id.</u> at 325.)  Subsequently, Plaintiff underwent a left ureteroscopy.  (<u>Id.</u> at 332-33.)

Plaintiff again saw Dr. Kondro in February 2011, reporting that he was having headaches and nausea when he drove at night.  (<u>Id.</u> at 358.)  He had pins and needles sensations in his left arm.  (<u>Id.</u>)  His ears rang.  (<u>Id.</u>)  He was sleeping "pretty well."  (<u>Id.</u>)

His psychiatric diagnoses included bipolar disorder, post traumatic stress disorder, ADD, GAD, and depression.  (Id.)

The following month, he consulted Dr. Kondro about his  migraines and kidney stones.  (Id. at 359.)

On week later, on Dr. Kondro's referral, Plaintiff underwent an evaluation at the Arthur Center by Michael Gordon, a licensed clinical social worker.  (Id. at 351-57.) Plaintiff presented with symptoms of anger, anxiety, depression, mania, and paranoia.  (Id. at 351.)  Plaintiff "describe[d] racing thoughts and says that he can switch from being 'OK' to very angry very quickly and with little provocation."  (Id.)  "[H]is mood switches several times per day sometimes."  (Id.)  His sleep schedule varied; however, he usually got six hours a night.  (Id.)  He was paranoid, feeling like he had enemies in the community.  (Id.)  He had episodes of memory loss, sometime forgetting things that had occurred in the past day or two.  (Id.)  He had had problems since he was a teenager, but they were lately getting worse.  (Id.) He had been hospitalized when he was fifteen years old after eluding cops he thought were trying to stop him.  (Id. at 351-52.)  He had been getting medication from Dr. Kondro since he was thirteen. (Id. at 352.)  He did not have any current suicidal ideation or intent to harm others; he was not a suicide risk.  (Id.)  He had difficulty maintaining employment and sustaining attention.  (Id. at 353.)  He had frequently been disciplined at school for behavior problems.  (Id.)  He had made enemies when he was a "snitch for the police."  (Id.)  When out in public, he was concerned he might run into someone who resented this cooperation.  (Id.) Plaintiff further reported that his wife had been laid off, her unemployment was running

out, and their financial situation was "getting very challenging." (Id.) His wife did most of the work caring for their three children and the house; he did the dishes and laundry when they piled up. (Id.) He had managed to better control his anger, but it was a problem when he was younger. (Id.) He had formerly abused alcohol and marijuana, but stopped when he was eighteen. (Id. at 353-54.) On examination, Plaintiff was alert; cooperative; casually dressed; had an anxious affect; had an anxious, depressed, and irritable mood; spoke excessively and rapidly; had appropriate eye contact; had a tangential and circumstantial flow of thought; and had fair insight and judgment. (Id. at 355.) He was well oriented. (Id.) Plaintiff was diagnosed with bipolar II disorder. (Id. at 356.) His current GAF was 50. (Id.) Plaintiff wanted to "explore medication options that can optomize [sic] his ability to function well." (Id.) He was to have a psychiatric evaluation by Sarmistha Bhalla, M.D. (Id.)

Plaintiff saw Dr. Bhalla two weeks later. (Id. at 347-50.) Plaintiff reported he had never used illicit drugs or alcohol. (Id. at 347.) Dr. Bhalla described Plaintiff as looking his stated age and being calm, cooperative, and well-oriented to time, place, and person. (Id. at 349.) His speech was normal in tone and volume; his attention, concentration, and memory were within normal limits. (Id.) His affect was appropriate; his mood was "'stressed out'"; his insight and judgment were fair. (Id.) Dr. Bhalla diagnosed Plaintiff with mood disorder, not otherwise specified, and ADHD, not otherwise specified. (Id.) His GAF was 60. (Id.) She prescribed an increased dosage of Depakote and renewed Plaintiff's prescriptions for Adderall, Xanax, Klonopin, and Abilify. (Id.) Plaintiff was to have his Depakote level checked in two weeks. (Id.)

At his April 14 visit to Dr. Kondro, Plaintiff reported he had had a seizure after going into a rage and passing out  (Id. at 360.)  He was to discontinue taking the Adderall.  (Id.)

Two weeks later, Plaintiff saw Dr. Bhalla, reporting he had not had his Depakote levels checked.  (Id. at 343-46.)  He was feeling better, but was irritable and having migraines.  (Id. at 343.)  At the time, he did not have a headache and was in a good mood. (Id.)  He was sleeping and eating well.  (Id.)  Although he was taking Xanax and Klonopin, he was not doing so regularly and was trying to stop.  (Id.)  On examination, his appearance was casual,  his mood and speech were normal, his affect was appropriate, his eye contact was good, his flow of thought was logical, his thought content was normal, and his judgment was fair.  (Id. at 344.)  His diagnoses were unchanged.  (Id.)  His GAF was 65.  (Id.)  He was to continue on his current medications and take them as prescribed.  (Id.)

After falling twenty feet off a roof in May, Plaintiff  had X-rays of his right ankle and left knee and CT scans of his head, cervical spine, chest, abdomen, and pelvis taken; all were negative.  (Id. at 362-66.)  Three days later, he informed Dr. Kondro he was still in a lot of pain from the fall.  (Id. at 361.)

When next seeing Dr. Bhalla, on June 30, Plaintiff informed her that his primary care physician had told him his Depakote levels were low.  (Id. at 370-73.)  He denied have any side effects.  (Id. at 370.) He was sleeping and eating well.  (Id.)  He was trying to avoid taking Xanax and Klonopin, and was not taking either regularly.  (Id.)  His diagnoses and GAF were as before.  (Id. at 372.)  He was again prescribed Adderall, as well as Abilify,

Klonopin, Xanax, and Depakote. (<u>Id.</u> at 372-73.) He was to increase his dosage of the latter and to take his medications as prescribed. (<u>Id.</u> at 373.)

In August, Plaintiff reported to Dr. Bhalla that he was constantly nauseous and thought the Depakote was to blame, although it did make him calmer. (<u>Id.</u> at 374-77.) His diagnoses and GAF were unchanged. (<u>Id.</u> at 377.) The Depakote was discontinued; the dosage of Abilify was increased. (<u>Id.</u>)

Also before the ALJ were assessments of Plaintiff's mental residual functional capacity.

In March 2010, Plaintiff underwent a psychological evaluation by Kim A. Dempsey, Psy.D., pursuant to his DIB and SSI applications. (<u>Id.</u> at 279-83.) Plaintiff reported symptoms of depression that included depressed mood, hopelessness, suicidal thoughts without a plan, loss of interest, and low motivation. (<u>Id.</u> at 279.) He had episodes of a decreased need for sleep and, during manic episodes, was irritable, impulsive, had grandiose and racing thoughts, and had thoughts of harming others. (<u>Id.</u>) He saw shadows out of the corner of his eye, suggestive to Dr. Dempsey of possible psychotic features. (<u>Id.</u>) He had symptoms of anxiety and "'extreme panic attacks.'" (<u>Id.</u>) He had been prescribed Abilify, lamotrigine, clonazepam, alprazolam, and citalopram. (<u>Id.</u>) The first two were for his bipolar symptoms; the second two were for his anxiety; and the fifth was for his depression. (<u>Id.</u>) Plaintiff reported he had suffered from depression since he was thirteen years old, but his more severe symptoms had begun after he and his wife had their second child. (<u>Id.</u>) He had been married for four years and has three children. (<u>Id.</u>) Because of his depression and low

motivation, he had difficulty doing household tasks.  (<u>Id.</u> at 280.)  His wife did the household chores. (<u>Id.</u>)

His scores on the Test of Memory Malingering suggested he put forth his best effort and did not malinger.  (<u>Id.</u>)  His scores on the Trail Making Tests A and B suggested deficits in his visual working memory.  (<u>Id.</u>)

On examination, Plaintiff "was adequate in appearance, wore appropriate clothing, and exhibited adequate personal hygiene."  (<u>Id.</u>)  His facial expressions were flat; his eye contact was fair; his attitude was "fairly cooperative"; his mood was depressed.  (<u>Id.</u>)  His speech was logical, coherent, relevant, and goal-directed.  (<u>Id.</u>)  He was oriented to time, place, person, and purpose.  (<u>Id.</u>)  "He did not present with psychotic symptoms during the assessment, but reportedly sometimes sees 'shadows out of the corner of [his] eye.'"  (<u>Id.</u> (alteration in original)).  He reported having suicidal ideation and some thoughts of harming others, but no plan or intent for either.  (<u>Id.</u>)  His abstract-conceptual thinking was adequate; his memory functions were problematic.  (<u>Id.</u>)

Dr. Dempsey described Plaintiff's daily activities as appearing to currently be restricted by mood symptoms and anxiety.  (<u>Id.</u> at 281.)  "There was evidence of impairment in his interests and personal habits."  (<u>Id.</u>)  He did not appear to have any significant difficulties in following simple instructions, and appeared to be capable of managing his own funds.  (<u>Id.</u>)  He had problems tolerating normal external stress and vocational pressures. (<u>Id.</u>)  She diagnosed Plaintiff with bipolar I disorder, mixed, severe, and panic disorder.  (<u>Id.</u>) His GAF was 50.  (<u>Id.</u>)

Later that same month, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (Id. at 284-95.) Plaintiff was assessed as having an organic mental disorder, i.e., ADD; an affective disorder, i.e., bipolar I disorder, mixed, severe; and anxiety-related disorders, i.e., GAD and panic disorder. (Id. at 284, 285, 287, 288.) These disorders resulted in mild restrictions in his daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 292.) There were no repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. DeVore assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 296.) In the area of sustained concentration and persistence, Plaintiff was not significantly limited in three of the eight listed abilities; was markedly limited in one, i.e., the ability to carry out detailed instructions; and was moderately limited in four, i.e., (i) maintaining attention and concentration for extended periods, (ii) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, (iii) working in coordination with or proximity to others without being distracted by them, and (iv) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (Id. at 296-97.) In the area of social interaction, Plaintiff was moderately limited in all but one of the five abilities. (Id. at

297.)  In the area of adaptation, he was moderately limited in two of the four abilities and not significantly limited in the other two.  (<u>Id.</u>)

In August 2011, Dr. Bhalla completed a mental functional capacity form for Plaintiff, rating him as having a "fair" ability in each of eight activities listed for the area of making occupational adjustments, each of three activities for the area of making performance adjustments, and each of the three activities for the area of making personal-social adjustments.  (<u>Id.</u> at 368-69.)  "Fair" was the third of four choices, with the first being "unlimited/very good" and the fourth being "poor."  (<u>Id.</u>)

<u>**The ALJ's Decision**</u>

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2014, and has not engaged in substantial gainful activity since his amended alleged onset date of April 1, 2009.  (<u>Id.</u> at 12.)  The ALJ next found that Plaintiff has severe impairments of migraine headaches, bipolar disorder, and anxiety disorder.  (<u>Id.</u>)  Plaintiff does not, however, have an impairment or combination of impairments that meets or medically equals one of listing-level severity.  (<u>Id.</u> at 13.)  Relying, in part, on Dr. Khushalani's opinion, the ALJ found that Plaintiff satisfies the "A" criteria for Listing 12.04 (affective disorders) and 12.06 (anxiety disorders).  (<u>Id.</u>)  He does not satisfy the "B" criteria for either Listing.  (<u>Id.</u>)  Specifically, he has moderate restrictions of activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, or pace.  (<u>Id.</u> at 14.)  And, Plaintiff has had no episodes of decompensation.  (<u>Id.</u>)  Also, Plaintiff does not satisfy the "C" criteria for either Listing.  (<u>Id.</u>)

The ALJ then determined that Plaintiff has the RFC to perform medium work[8] with additional limitations of (a) not working at unprotected heights; (b) not climbing, operating moving or dangerous equipment; and (c) no commercial driving. (<u>Id.</u> at 15.) Plaintiff has moderate limitations in his abilities understand, remember, and carry out complex instructions and in his ability to make judgments on complex work-related decisions. (<u>Id.</u>) He has mild limitations in his ability to respond appropriately to usual work situations and in his ability to interact appropriately with the public and with co-workers. (<u>Id.</u>) He has no limitations in his abilities to understand, remember, and carry out simple instructions; to make judgments on simple work-related decisions; and to interact appropriately with supervisors. (<u>Id.</u>)

When assessing Plaintiff's RFC, the ALJ evaluated his credibility and found him not to be entirely credible as to the severity and effects of his symptoms. (<u>Id.</u> at 16.) This was based, in part, on his daily activities, the medical record, and his failure to comply with treatment recommendations and medications. (<u>Id.</u> at 16-18.)

The ALJ declined to give the assessments of Drs. Kondro and Bhalla any weight as both were inconsistent with the record. (<u>Id.</u> at 19.) Also, Dr. Kondro's opinion that Plaintiff is disabled is a determination to be made by the Commissioner. (<u>Id.</u>)

With his RFC, Plaintiff is unable to perform his past relevant work. (<u>Id.</u> at 20.) With his age, education, work experience, and RFC, he is able to perform the jobs described by

---

[8]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). If someone can do medium work, he can do sedentary or light work. <u>Id.</u>

the VE.  (Id. at 21.)  Consequently, he is not disabled within the meaning of the Act.  (Id. at 21.)

**Additional Records before the Appeals Council**

Plaintiff submitted additional medical records to the Appeals Council in support of his request for review.  These records are with from Dr. Kondro or from the Herman Area District Hospital.

In August 2011, Plaintiff saw Dr. Kondro for a follow-up for his complaints of migraines, reporting he had been having them several times a month and had been getting very good relief with a particular medication (the name of is illegible).  (Id. at 420.)  In October, Plaintiff returned for a recheck of his kidney stones and migraines.  (Id. at 421.)  Both conditions had been better until he was in an altercation with home invaders.  (Id.)  He was to see Dr. Bhalla the next week.  (Id.)  In January 2012, Plaintiff informed Dr. Kondro that he was doing fairly well.  (Id. at 422.)  His left hand ached after he was in an altercation.  (Id.)

In April 2012, Plaintiff informed Dr. Kondro he had developed a severe headache after a family problem and had had a seizure.  (Id. at 423.)  A workup at the emergency room was negative.  (Id.)  Plaintiff was angry and expressed suicidal and homicidal ideation.  (Id.)  Plaintiff and his wife were referred to the crisis intervention program at Arthur Center; a telephone call verified that they went there and were in counseling.  (Id.)

Dr. Kondro wrote on February 16, 2012, that Plaintiff was currently unable to work due to his bipolar affective disorder.  (Id. at 380.)

Plaintiff went to the emergency room at Herman Area District Hospital in July 2011 for a toothache; he was prescribed Percocet and told to see a dentist as soon as possible.  (Id. at 382-89.)  He returned to the emergency room in January 2012 for treatment of joint pain in his left hand.  (Id. at 390-92.)  An x-ray of the hand was "[g]rossly normal."  (Id. at 391.)  In March, he went to the emergency room for treatment of right flank pain, nausea, and painful urination for past two days.  (Id. at 393-402.)  He was given Percocet and Tylenol.  (Id. at 395.)

Plaintiff returned to the emergency room in April for treatment of a seizure that had occurred three hours earlier and a headache that had begun two hours earlier.  (Id. at 403-17.)  He had lost consciousness.  (Id.)  He refused to do a urine screen.  (Id.) Chest x-rays were normal, as was a CT scan of his brain.  (Id. at 409, 410.)  It was noted he had stopped taking Depakote on his own because he could not tolerate it and had last had a seizure one year earlier.  (Id. at 406.)  No seizure activity was noticed in the emergency room.  (Id. at 407.)  After his headache improved on medication and his twitching improved, he was discharged with instructions to see a neurologist as soon as possible and to take his home medications as directed.  (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only

the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the

claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the

Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred by not giving the opinions of Drs. Kondro and Bhalla greater weight, not discussing the weight given to Dr. Dempsey's evaluation, and not explaining why Dr. DeVore's opinion should be given great weight. The Commissioner disagrees.

It is undisputed that Drs. Kondro and Bhalla are Plaintiff's treating physicians. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

The one-sentence opinions of Dr. Kondro are similar: Plaintiff has bipolar affective disorder and is disabled. (R. at 268, 341, 342.) "[A] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." **Hamilton v. Astrue**, 518 F.3d 607, 610 (8th Cir. 2008). Moreover, "[a] medical source opinion that an applicant is 'disabled' . . . involves an issue for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005). And, another consideration lessening the weight to be given Dr. Kondro's opinion is the checklist format of his notes. The Eighth Circuit Court of Appeals has "recognized that a conclusory checkbox form has little evidentiary value when

it 'cites no medical evidence, and provides little to no elaboration.'" **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (quoting <u>Wildman v. Astrue</u>, 596 F.3d 959, 964 (8th Cir. 2010)).

Plaintiff first saw Dr. Bhalla in March 2011. Her notes describe his attention, concentration, and memory as being within normal limits. His insight and judgment were fair. He was well-oriented to time, place, and person. She rated his GAF as 60, indicative of moderate symptoms and one point below the beginning of the range for mild symptoms. At his visit the next month, Plaintiff was rated as having a GAF within the range for mild symptoms. He had a logical flow of thought, normal thought content, and fair judgment. His mood and speech were normal; his affect was appropriate. This was so even though he was not compliant with his medications. Plaintiff saw Dr. Bhalla in June and again in August; his GAF remained 65. On the form completed in August for Plaintiff, however, Dr. Bhalla assessed him as having a "fair" ability in all fourteen listed activities. This was but one step away from the fourth and worst ability: "poor." "'[A]n ALJ may discount or even disregard the opinion of a treating physician . . . where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" **Wildman**, 596 F.3d at 964 (quoting <u>Goff</u>, 421 F.3d at 790). <u>Accord</u> **Davidson**, 578 F.3d at 843 ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). Dr. Bhalla's dire view of Plaintiff's mental residual functional capacity is inconsistent with her three treatment notes, including her ratings of his GAF and her psychiatric findings on examination.

Plaintiff further argues that the ALJ was obligated to recontact Drs. Kondro or Bhalla if finding, as he did, that their opinions are of no weight. "The ALJ has a duty to fully and fairly develop the evidentiary record," **Byes v. Astrue**, 687 F.3d 913, 915-16 (8th Cir. 2012), "includ[ing] seeking clarification from treating physicians if a crucial issue is underdeveloped or undeveloped," **Smith v. Barnhart**, 435 F.3d 926, 930 (8th Cir. 2006). If the record is sufficiently developed, the ALJ does not err in not recontacting the treating physicians for further clarification, examinations, or tests. **Johnson v. Astrue**, 627 F.3d 316, 320 (8th Cir. 2010). "'The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are inadequate . . . to determine whether [the claimant] is disabled such as when the report from [the] medical source contains a conflict or ambiguity that must be resolved . . . .'" **Jones**, 619 F.3d at 969 (quoting <u>Goff</u>, 421 F.3d at 791) (second alteration in original). Neither Dr. Kondro's nor Dr. Bhalla's notes were inadequate for the purpose of determining whether Plaintiff is disabled. Rather, they were adequate, but did not support his claims. <u>See</u> **Martise v. Astrue**, 641 F.3d 909, 927 (8th Cir. 2011) (noting that "a lack of medical evidence to *support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability"). "Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment," **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013). Plaintiff simply failed to do so.

Plaintiff contends that without the opinions of Drs. Kondro and Bhalla, the ALJ did not have the necessary medical evidence from which to determine his RFC and, consequently,

the ALJ's RFC findings are mere conjecture. "'[S]ome medical evidence must support the determination of the claimant's RFC.'" **Martise**, 641 F.3d at 923 (quoting Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)). "'However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" **Id.** (quoting Vossen, 612 F.3d at 1016). In the instant case, the ALJ had medical records, including those of Drs. Apte and Bhalla, and the opinion of Dr. Khushalani that support his RFC findings. His disregard of the opinions of Drs. Kondro and Bhalla does not equate with a lack of medical evidence.

Plaintiff further challenges the ALJ's RFC determination for his failure to include a finding that he cannot work on a sustained basis. The evidence of Plaintiff's need to lie down for at least two hours every day is his testimony. "[Plaintiff] fails to recognize that the ALJ's determination regarding [his] RFC was influenced by his determination that [his] allegations were less than fully credible, and [the Court] give[s] the ALJ deference in that determination."[9] **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (internal quotations omitted).

Plaintiff next challenges the ALJ's failure to discuss the weight he gave to Dr. Dempsey's opinion. The ALJ did, however, discuss that opinion, noting such inconsistencies as (a) Plaintiff reporting seeing shadows out of the corner or his eye and her report he did not present with psychotic symptoms and (b) his apparent functioning in the average-t-low average range of intelligence and his lack of any evidence of memory deficits and of difficulty following simple instructions. (R. at 17.) Assuming, without deciding, that the failure is an

---

[9]The Court notes Plaintiff does not challenge the ALJ's credibility determination.

error, for it not to be harmless Plaintiff "must provide some indication that the ALJ would have decided differently if the error had not occurred." **Byes**, 687 F.3d at 917. Given the inconsistencies specifically cited by the ALJ, it is clear that any lack of a discussion on the weight he gave Dr. Dempsey's opinion is not reversible error. Moreover, the opinion of a consulting health care professional is generally not considered substantial evidence when she has examined claimant only once. **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004).

The ALJ did explicitly give Dr. DeVore's opinion "great weight." (R. at 19.) Plaintiff argues this is error because the ALJ did not explain his reasoning. "Although it is true that the opinion of a reviewing physician alone does not constitute substantial evidence," an ALJ does not commit error when that opinion is not the only evidence relied upon. See **Anderson v. Shalala**, 51 F.3d 777, 779 (8th Cir. 1995). As in **Anderson**, the ALJ in the instant case "conducted an independent analysis of the medical evidence." **Id.**

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.




/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of February, 2014.